**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------X

Julie Zanotti, Ronese Brooks, and Sherry Porter,
On Behalf of Themselves and All Other
Persons Similarly Situated

                       Plaintiffs,

     -against-

Invention Submission Corporation d/b/a InventHelp,
Technosystems Consolidated Corp., Technosystems
Service Corp., Western Invention Submission Corp.,
Universal Payment Corporation, Intromark Incorporated,
Innovation Credit Corp., Robert J. Susa, Invents Company,
Invents Company, LLC, Global Express Manufacturing,
Smithlilly Manufacturing; Zambro Manufacturing, Inc.,
Abrams Gentile Entertainment, LLC, Abrams Gentile
Entertainment, Inc., Ashkan Najafi, Esq., RG Patent
Consulting LLC, Rachel Gilboy, Thomas Frost, P.A.,
Thomas Frost, Law Office of Kyle Fletcher, P.C.,
Kyle A. Fletcher, Crossley & Stevenson, Kaufhold
& Dix, Ruth Eure, Patents for People, John Doe
Companies 1-10; John Doe Individuals 1-10,
                       Defendants.

------------------------------------------------------------------X

Index No: 18-cv-05893-NSR

**Amended Class Action**
**Complaint**

**Jury Trial Demanded**

      Plaintiffs, by their attorneys, Oxman Law Group LLP, on behalf of themselves and all

others similarly situated, make the following allegations on personal knowledge as to their own

actions and upon information and belief:

## NATURE OF THE ACTION

1.      This class action arises out of a deceptive and fraudulent invention promotion scam that has bilked thousands of aspiring inventors and entrepreneurs into paying millions of dollars to Defendants for invention promotion services that Defendants do not, and never intend to, provide.

2.      Defendants herein are part and parcel of a sophisticated and grand scheme that has fraudulently enriched themselves at the expense of innocent and often naive aspiring inventors.

3.      Defendants' ubiquitous television and internet commercials, featuring a cartoon image of a caveman sitting on a rock, banging a wheel with a chisel, promise consumers that InventHelp has contracts with thousands of companies that are looking for new ideas.  The commercials state, "We keep your idea confidential"; "We explain every step of the invention process"; "We create professional materials representing your idea and submit it to companies who are looking for new ideas"; "We have more  than 9,000 companies who have agreed to review ideas, in confidence," among other representations.  In truth and in fact, InventHelp is not in the business of helping aspiring inventors develop and monetize their inventions.  Rather, InventHelp is in the business of taking consumers' money with fraudulent promises and oftentimes phony "companies looking for new ideas."

4.      Defendants' entire business model and enterprise is fraudulent, from start to finish. After being lured in by Defendants' slick advertising and sales tactics, Class Plaintiffs are then induced to sign expensive contracts based upon Defendants' purposefully incomplete 'patent searches,' each and every one of which informs Class Plaintiffs, in identical boilerplate language, that although there are already patented products on the market similar to those proposed by Plaintiffs, "protection in the form of a utility patent may be available directed to the specific novel structural or functional features of your invention."

5.    After receipt of fees ranging from $10,000 to $30,000 per consumer, Defendants then purportedly begin the process of "marketing" Class Plaintiffs' inventions. This too is a scam – contrary to Defendants' representations, they do not have relationships with "more than 9,000 companies who have agreed to review ideas, in confidence."

6.    Defendants' "marketing" does not and cannot lead to licensing agreements for Class Plaintiffs – Defendants are purportedly "marketing" non-patented, undeveloped ideas, which, by virtue of that status, have little to no salability.

7.    Defendant InventHelp is the conduit through which all Class Plaintiffs are defrauded, regardless of whether their ultimate dealings are with InventHelp, Invents or any of the other named Defendants. Whilst InventHelp and Invents hold themselves out to be unrelated companies, many Class Plaintiffs who initially call InventHelp are then routed to Invents Company. Others are sent to InventHelp representatives. The schemes, trickery, and fraud set forth herein are universal and indistinguishable, notwithstanding the titles of the entities with which Class Plaintiffs believe they are dealing.

8.    Defendants craft their polished marketing materials (including television advertisements, internet ads, web pages and telemarketing calls) to create the impression that Defendants have successfully helped other inventors monetize their inventions, and thus that Defendants are reliable and reputable. Defendants' temporary, rented offices are decorated with supposed successful inventions, often labeled, "As Seen On TV," in order to further create the impression that they are a legitimate enterprise. In truth and in fact, Defendants are a fraud and fail to fulfill almost every promise they make to consumers.

9.    Defendants' multi-tiered conspiracy preys upon aspiring inventors' high hopes and dreams. It is cleverly constructed to avoid liability and monetary judgment by employing an

intricate web of seemingly independent entities – invention promotion companies, private money

lenders, patent attorneys, licensing and distribution companies, and manufacturing companies –

that act in concert to defraud Class Plaintiffs.

          10.     Defendants employ sophisticated and crafty mechanisms to escape liability,

including the insertion of fraudulent clauses into their various contracts designed to extinguish

would-be private litigants' rights.

          11.     After luring Class Plaintiffs in with slick television and internet advertising,

Defendants assure each and every consumer who inquires of their services that Plaintiffs' ideas are

unique, patentable, and/or carry terrific potential for immense profit.

          12.     Defendants then offer loans, research, patenting, invention promotion, marketing,

manufacturing, licensing and distribution services to individual consumers located throughout

New York and the United States.

          13.     In exchange for fees ranging between $700 and $30,000, Defendants represent that

they will obtain patents and produce models, press releases, and infomercials, among other things,

to promote Class Plaintiffs' inventions.

          14.     Then, because Class Plaintiffs often do not have at hand the thousands of dollars

'necessary' to make their dreams come true, they are offered generous loans by "independent

private money lenders" Innovation Credit Corporation, which represents itself on its website

(www.innovationcredit.com) as a company that specializes in "lending to qualified individual

inventors who have a great idea, but lack the resources to launch it into a successful product,"

and/or Universal Payment Corporation, another purportedly 'independent' money lender.

15.    These "independent private money lenders" are not independent at all – they operate under the same ownership and control as InventHelp and Invents, and are an indispensable arm of the fraudulent scheme described herein.

16.    Class Plaintiffs then agree to pay the steep initial fees out of pocket (often selling personal property, remortgaging their homes, or borrowing from family members) or to loan the money from Defendants Innovation Credit Corporation or Universal Payment Corporation. In the meantime, Defendants make off with Class Plaintiffs' money and do little to nothing to fulfill their end of the bargain, stringing Class Plaintiffs along with false promises and boilerplate "analyses" in order to extract more money from them for additional services (which they do not and never intend to provide), and then disappearing and dodging calls as soon as Defendants have all the money in hand.

17.    After months or years of silence, Defendants reappear to Class Plaintiffs, sometimes in the guise of distribution, marketing or manufacturing companies, and other times as representatives of InventHelp or Intromark Incorporated, Plaintiffs' "licensing agents," telling Class Plaintiffs that they've discovered Class Plaintiffs' inventions, that they have purchase orders, licensing agreements, and/or retail distributors at the ready, and that they just need an additional $5000-$10,000 in order to make those final arrangements. After scamming more money from Plaintiffs, they disappear without a trace.

18.    Fraud permeates all of the dealings and contracts between Class Plaintiffs and all Defendants herein, from start to finish. Defendants' enterprise as a whole is fraudulent, and Defendants fraudulently induce Class Plaintiffs to sign various contracts.

19.    Defendants also fraudulently misrepresent the actual content of the contracts between Defendants and Class Plaintiffs, thereby tricking Class Plaintiffs into signing documents

that state different terms and conditions than those represented by Defendants (*fraud-in-the-factum*).

20.    Before consumers have the opportunity to meaningfully review the lengthy, complicated contracts at issue, Defendants use high-pressure tactics, routinely telling consumers that "today is the very last day" of a "special" or "promotion" that will save consumers hundreds or thousands of dollars, but that in order to get these savings, consumers must sign immediately, before leaving the office.  These statements are false and fraudulent – there are no such "specials" or "promotions" that are about to expire.

21.    Defendants' actions are particularly egregious because many of their customers are of modest means.  Defendants' representatives employ high pressure tactics to push Class Plaintiffs to hand over tens of thousands of dollars and sign fraudulent contracts, falsely representing to Class Plaintiffs the actual content of those contracts, that if Class Plaintiffs sign immediately (without time to properly review the contracts) they will receive substantial discounts pursuant to "specials" that are about to expire,  that Class Plaintiffs' proposed inventions are one-of-a-kind and/or carry terrific potential for profit, and that Class Plaintiffs likely stand to make 'millions' or 'billions' if they engage Defendants' services.

22.    In truth and in fact, Defendants do not (nor ever intend to) fulfill the bulk of the promises they make to Plaintiffs, instead making off with their money and leaving Plaintiffs high and dry.

23.    Defendants also employ deceptive and fraudulent tactics by using threats, intimidation and harassment to collect debts.  In order to induce Class Plaintiffs to sign contracts, Defendants represent that if Class Plaintiffs can no longer make payments, then there is "no risk" – the contracts will simply expire with no further performance on either end.  However, if and when

Class Plaintiffs stop paying, Defendants dog Class Plaintiffs and threaten to "destroy" Plaintiffs' credit and threaten to put liens on their homes and other personal property.

24.     Defendants call Class Plaintiffs multiple times per day, often on Plaintiffs' cell phones, and verbally threaten and harass, oftentimes using foul language.

25.     As detailed *infra*, Defendants' actions violate the American Inventors Protection Act of 1999, the Telephone Consumer Protection Act, New York consumer protection statutes, and give rise to liability pursuant to a variety of common law claims, including fraud, breach of contract, breach of implied covenant of good faith and fair dealing, among others.

### THE PARTIES

26.     Plaintiff Julie Zanotti ("Ms. Zanotti" or "Plaintiff") is an individual who is a citizen of the State of New York, residing at 19 Clubhouse Road, Putnam Valley, New York, 10579.

27.     Plaintiff Ronese Brooks ("Ms. Brooks" or "Plaintiff") is an individual who is a citizen of the State of New York, residing at 1 Glenwood Avenue, #24C, Yonkers, New York 10701.

28.     Plaintiff Sherry Porter ("Ms. Porter" or "Plaintiff") is an individual who is a citizen of the State of New York, residing at 99 Mill Road, Rochester, New York, 14626.

29.     The entities and individuals listed in paragraphs 30 - 52 have engaged in and have conspired to engage in a pattern of fraudulent activity, have each committed numerous criminal acts as part of their scheme to defraud Class Plaintiffs, have each participated in the operation or management of a fraudulent and criminal enterprise, and have each acted with actual authority and/or apparent authority on behalf of each and every Defendant herein.

30.    Defendant Invention Submission Corporation does business under the names 'InventHelp,' and 'Innovation Communications,' among others, and is located in the same office, and shares identical employees, with InventHelp, Technosystems Consolidated Corporation, Western Invention Submission Corporation, Technosystems Service Corporation, and Intromark Incorporated (collectively, "InventHelp Defendants").  Moreover, as detailed *supra*, consumers who sign contracts with InventHelp and/or Western InventHelp sign an explicit acknowledgement that InventHelp, Invention Submission Corp., Western InventHelp, and Technosystems Service Corporation will all be performing services under the contracts, regardless of the particular contract's corporate signatory.  Additionally, all contracts signed by any InventHelp Defendant were ultimately signed by Angela Beauchamp on behalf of each and every entity.

31.    Upon information and belief, Defendants "Invents Company" and "Invents Company LLC" are affiliated with and/or identical to InventHelp, and many individuals who contact InventHelp are subsequently rerouted to Invents Company and/or Invents Company LLC. These entities, together with the other Defendants, operate in concert to perpetrate the scheme described herein, and are purposefully arranged in a shell corporate structure and with differing corporate and company names in order to perpetrate the scheme and evade liability and collection of damages.

32.    Defendant Invention Submission Corporation d/b/a/ InventHelp and d/b/a/ Innovative Communications, is a Pennsylvania corporation with its principal place of business located at 217 Ninth Street, Pittsburgh, Pennsylvania 15222, and is registered to do business under the name InventHelp.  The InventHelp website lists a New York office located at 14 Penn Plaza, #958, New York, New York 10122.

33.    Defendant Technosystems Consolidated Corporation identifies its "web URL" as "www.inventhelp.com."  It is a Delaware corporation with its primary place of business located at 217 Ninth Street, Pittsburgh, Pennsylvania 15222.  Upon information and belief, Defendant Technosystems Consolidated Corporation is a parent company of InventHelp and Invention Submission Corporation.  Bloomberg identifies the "web URL" of Technosystems Consolidated Corporation as "www.inventhelp.com."  Upon information and belief, many proposed Class Plaintiffs who sign contracts with InventHelp, Universal Credit Corp., Intromark, and/or Western InventHelp are actually charged on credit card statements by Technosystems Consolidated Corporation.

34.    Defendant Technosystems Service Corporation is a Delaware Corporation with a primary place of business located at 217 9th Street, Pittsburgh, PA 15222.  Individuals who contract with InventHelp and/or Western InventHelp sign an explicit acknowledgement that Technosystems Service Corporation will:  "engage in performing invention development services under this Contract."  Upon information and belief, Technosystems Service Corporation is affiliated with InventHelp, Invention Submission Corporation and other Defendants herein and is used in Defendants' perpetration of the scheme described herein.

35.    Defendant Western Invention Submission Corporation ("WISC") is a North Carolina Corporation with a principal place of business located at 217 9th Street, Pittsburgh, PA 15222.  Individuals who contract with WISC sign the following acknowledgement:  "[WISC] is the name of the corporation contracting to perform the Invention development services.  WISC is operating under its registered name, Western InventHelp.  Western Inventhelp's principal business address is : 217 Ninth Street, Pittsburgh, Pennsylvania 15222.  There are no parent, subsidiary or affiliated companies that will engage in performing invention development services

9

under this Contract other than INVENTION SUBMISSION CORPORATION, 217 Ninth Street,

Pittsburgh, Pennsylvania, 15222, an affiliate, and TECHNOSYSTEMS SERVICE CORP., 217

Ninth Street, Pittsburgh, Pennsylvania, an affiliate."

36.    Defendant Universal Payment Corporation is a Pennsylvania Corporation with a

principal place of business listed at 903 Liberty Avenue, 3rd Floor, Pittsburgh, PA 15222.  Upon

information and belief, all individuals who finance their contracts with InventHelp and/or

Western InventHelp do so through this entity, which is not independent and is affiliated with

InventHelp.  Additionally, upon information and belief, many individuals who sign contracts with

InventHelp and/or WISC are charged by Universal Payment Corporation, even though many of

these individuals did not sign contracts with Universal Payment Corporation.

37.    Defendant Robert J. Susa is President of Defendants Invention Submission

Corporation, Technosystems Consolidated Corporation, Technosystems Service Corporation,

Western Invention Submission Corporation, Innovation Communications, Intromark, Inc., and

InventHelp.  Upon information and belief, Mr. Susa is an individual who is a citizen of the State

of Pennsylvania, residing at 86 Waterfront Drive, Pittsburgh, Pennsylvania 15222.

38.    Defendant Invents Company is a Delaware corporation with its principal place of

business located at 450 7th Avenue, Suite 1107, New York, New York 10123.  The website for

Defendant Invents Company – www.invents.com – states:  Headquartered in the heart of the

business and financial mecca of the world, New York City, Invents Company has access to the

resources needed to bring new products to market. We also have nationwide branch locations so

that our clients can meet with us in person.

Invents Company is more than a product development solution – we are a full-service marketing
and advertising agency. This means we can give your invention the exposure it needs to be a
success!"

10

39.     Defendant Invents Company LLC, is a Delaware limited liability company with its principal place of business located at 469 7th Avenue, 7th Floor, New York, New York 10018. Upon information and belief, Invents LLC is identical to or affiliated with Invents Company and shares the same website, www.invents.com.   (Defendants Invents Company and Invents Company LLC are hereinafter collectively referred to as "Invents.")

40.     Defendant Abrams Gentile Entertainment LLC is listed on documents obtained by Plaintiff as having a principal place of business at 244 West 54th Street, 9th Floor, New York, New York.  The existence of that actual entity is questionable.  However, Abrams Gentile Entertainment, Inc. is a New York corporation with a principal place of business at 11 Middleneck Road, Suite 200, Great Neck, New York, 10021.

41.     Defendant Innovation Credit Corporation ("ICC") is a New York corporation with its principal place of business located at 1 Penn Plaza, Suite 6289, New York, New York 10119. Some "Promissory Notes" referred to herein list ICC's address as 654 Bellamy Avenue, #1072, Murrells Inlet, SC 29576.

42.     Defendant Zambro Manufacturing, Inc., is a Wisconsin company with its principal place of business located at 250 E. Wisconsin Avenue, Suite 1800, Milwaukee, WI 53202-4299. Zambro claims to provide custom manufacturing for electronics, plastic, wood, and metal products.

43.     Defendant Global Express Manufacturing is a Wisconsin company also with its principal place of business located at 250 E. Wisconsin Avenue, Suite 1800, Milwaukee, WI 53202-4299 (identical to Zambro Manufacturing).  Upon information and belief, Global Express Manufacturing is also purportedly located at 3505 Constitution Ave NE, Albuquerque, New Mexico 87106.

44.      Defendant Smith Lilly Health & Beauty Manufacturing Supply is an Indiana company with its principal place of business located at 1251 N. Eddy Street, Suite 200, South Bend, IN 46617.

45.      Defendant Ashkan Najafi, Esq., is an attorney licensed to practice in the State of Florida, with a primary place of business located at 6817 Southpoint Parkway, #1803 Jacksonville, Florida 32255-1339

46.      Defendant RG Patent Consulting LLC, is an "intellectual property and consulting organization," with a principal place of business located at P.O. Box 25895, Scottsdale, Arizona 85255.  Defendant Rachel Gilboy is a citizen and resident of the State of Arizona and is the principal of RG Patent Consulting LLC.

47.      Defendant Thomas Frost is a citizen and resident of the State of Florida, is the principal of Defendant Thomas Frost P.A., and is a patent attorney licensed to practice in the State of Florida, with a primary place of business at 6600 Fourth Street North, Suite 102, Saint Petersburg, Florida 33702.

48.      Defendant Kyle A. Fletcher is a citizen and resident of the State of North Carolina, is the principal of Defendant Law Office of Kyle Fletcher, and is a patent attorney licensed to practice in the State of North Carolina, with a primary place of business at 1515 Mockingbird Lane, Suite 500, Charlotte North Carolina 28209.

49.      Defendant Crossley & Stevenson is a patent law firm, with principal places of business located at 236 South Third Street, # 287, Montrose, Colorado 81401 and 63 Mercill Avenue, #12, Jackson Wyoming 83001.

50.    Defendant Kaufhold & Dix is a patent law firm, with principal places of business located at 744 Metro Blvd., Suite 420, Edina, Minnesota 55439 and 6330 South Western Avenue, Suite 100, Sioux Falls, South Dakota 57108.

51.    Defendant Ruth Eure is a patent agent and the principal of Defendant Patents for People, with a principal place of business located at 4795 Edison Avenue, Boulder Colorado, 80301.

52.    Defendants 'John Doe' Individuals and 'John Doe' Companies exercise complete domination over all the entities named herein and use the entities and such domination to commit the fraud described herein.


## JURISDICTION

53.    This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331, 1332(d)(2)(A).  This Court has original jurisdiction over this civil action as it arises under the Constitution, laws or treaties of the United States, including the American Inventors Protection Act of 1999, 35 U.S.C. § 297, and the Telephone Consumer Protection Act, 47 U.S.C. § 227.

54.    Venue is proper pursuant to 28 U.S.C. § 1391.

55.    Exercise of personal jurisdiction over Defendants is proper pursuant to C.P.L.R. §§ 301, 302.  Defendants regularly transact extensive business activities in the State and are licensed and/or authorized to do business in the State.  Defendants have transacted and continue to transact business in the State, have engaged in tortious conduct in the State, and there is a substantial nexus between Defendants' purposeful availment of the New York forum and Plaintiff(s)' claims.

56.     This Court is a proper venue for this action because it is where a substantial part of the events and omissions giving rise to Plaintiffs' causes of action took place, and named Plaintiffs are residents of Westchester, New York. Defendants regularly conduct business in the State of New York and within Westchester County.

57.     Defendants have significant contact with New York such that they are subject to the personal jurisdiction of this Court. This Court's assertion of jurisdiction over Defendants is consistent with the notions of fair play and substantial justice. One or more Defendants purposefully availed themselves of the benefits of this State such that they could reasonably anticipate being hauled into Court here, or otherwise directed their conduct toward this State such that the effects of their damages were occasioned upon Plaintiff(s) within this State.

**FACTUAL BASIS FOR CLAIMS**

58.     During 2014, Plaintiff Julie Zanotti, a professional hair stylist, believed that she had created a new invention: a hollow comb that could be filled with styling products that would evenly distribute the products throughout hair by ejecting the product through the teeth of the comb. She named her invention "The Distributor" and/or "Liqui Comb."

59.     Plaintiff saw various television spots advertising the services of the company InventHelp. Plaintiff was struck by the advertisement's cartoon image of a caveman sitting on a rock, banging a wheel with a chisel.

60.     On or about May 2014, Plaintiff contacted InventHelp by telephone to inquire about their services.

61.     An InventHelp representative answered the telephone, took Ms. Zanotti's name, telephone number, and address, and promised that someone from the InventHelp team would

return her call shortly.  Upon information and belief, these same representations were made to all Class Plaintiffs who called InventHelp.

62.    Ms. Zanotti then received written materials and a call from a representative from "Invents Company."  Upon information and belief, many consumers who contact InventHelp are subsequently contacted by and/or redirected to an "Invents Company" representative.

63.    Although 'InventHelp' and 'Invents Company' hold themselves out to the public to be competitors and/or wholly unrelated entitles, upon information and belief they are part and parcel of the same grand scheme.

64.    Indeed, upon information and belief, many individuals who purportedly work for and/or represent Invents, also work and/or worked with Invention Submission Corporation d/b/a/ InventHelp as well as the fraudulent distribution and marketing companies within this scheme. For example, upon information and belief, some Class Plaintiffs met with a representative named Chet Dombrowski.

65.    Upon information and belief, Chet Dombrowski worked for Invention Submission Corporation d/b/a/ InventHelp, as well as Invents Company during the same time period. Independently, he also held himself out to Class Members to be an "Authorized License Agent" for Global Express Manufacturing and 'Smithlilly Health & Beauty Manufacturing' and represented that he had never worked for or with Invents, InventHelp, or any other invention promotion company.

66.    The Invents Company website (www.invents.com) advertises the company as follows: "Invents Company is more than a product development solution – we are a full service marketing and advertising agency. This means we can give your invention the exposure it needs to be a success!"

67.    The Invents Company website further states: "No other solution can offer you the market saturation that our service delivers – making sure the right person sees your idea is crucial to being a successful inventor. We don't stop with just showing off your idea either, we carefully monitor the results of our efforts and include the market data in our presentations to manufacturers. This information can tip the scales in your favor when a manufacturer is making a decision on whether to produce your product or not."

68.    The Invents Company website further states:  "Once you have patent protection, we will take the presentation materials developed by us (while working with you) and contact major manufacturers in your invention's industry and attempt to procure a licensing agreement on your behalf. Once a manufacturer displays interest in your invention idea, our licensing negotiation team will contact you and work side by side with you in entering into a fair and profitable licensing agreement."

69.    On or about May 5, 2014, Plaintiff met with Invents Company at their offices located at Wooodbridge Towers, 555 Route One South, Suite 140, Iselin, New Jersey 08830, to inquire about whether her idea was appropriate for their services.  Upon entering Invents' office, Plaintiff was given the impression that Invents had successfully helped other inventors, and thus that they are a reliable and reputable company.  Defendants' offices were decorated with supposed successful inventions, often labeled, "As Seen On TV," in order to further create the impression that the entity is a legitimate enterprise.

70.    At that meeting, she was assured by an Invents representative, Pamela Mitchell, that her idea was not only viable, but that it was original and presented an excellent opportunity for profit.  Ms. Mitchell told Ms. Zanotti that Invents had contacts at the well-known brand, "Paul Mitchell Hair Products," who would be very interested in hearing about Plaintiff's idea. Upon

16

information and belief, these statements were knowingly false when made and/or were made with reckless disregard for their truth or falsity.

71.      On information and belief, Plaintiff's comb idea is not novel, non-obvious, or otherwise unavailable to the public, and several companies already manufacture and sell products similar to Plaintiff's idea.

72.      Upon information and belief, all Class Plaintiffs were told that their proposed inventions were novel, marketable, and/or presented excellent opportunities for profit during their initial meetings with Defendants.

73.      At that meeting, Invents did not inform Plaintiff of, *inter alia*, the number of customers it had in the last five years, the number of positive and negative evaluations, the number of customers who received a net profit from inventions, the number of customers who received license agreements, or the names and addresses of invention promotion companies with whom Invents or its officers were affiliated in the last ten (10) years.

74.      At that meeting, the Invents representative expressed excitement about the prospects for Plaintiff's proposed invention, and told Ms. Zanotti that Invents would partner with her for $7,950.00.

75.      At that meeting, Plaintiff told the Invents representative that she could not afford the $7,950.00 fee.

76.      The Invents representative told her that there was a solution to her problem – Ms. Zanotti could loan the money from a separate, 'independent' company, Defendant Innovations Credit Corporation, with offices located at 1 Penn Plaza, New York, New York.  Upon information and belief, Defendants made these same representations to all Plaintiffs who said that they did not have the funds available to pay the steep initial fees.

17

77.     The Invents representative conveniently had a loan application from Innovations Credit Corporation on hand.

78.     Innovations Credit Corporation's website states that it specializes in "lending funds to individuals with promising inventions, who lack the resources to successfully launch it into a product."

79.     Plaintiff expressed concern that she may not qualify for the loan and that she could not afford high loan payments.

80.     The Invents representative explicitly told her that her idea was special and presented a high probability for profit, that "everyone" qualifies for the loan, and that there is no credit check. Upon information and belief, substantially the same representations were made to all Class Members.

81.     The Invents representative pressured Ms. Zanotti, explaining that her idea was very promising, and that the loan was interest-free. Upon information and belief, Defendants made this representation to all Class Plaintiffs when discussing the potential loan.

82.     The Invents representative explicitly told her that she should take out the loan in order to monetize her invention. The Invents representative told Ms. Zanotti that Invents and ICC are successful companies, and that Plaintiff too would be successful with her invention. Upon information and belief, Defendants made these representations to all Class Plaintiffs.

83.     Thereafter, Ms. Zanotti signed a "Promissory Note" dated May 5, 2014 with Innovation Credit Corporation, 654 Bellamy Avenue, #1072, Murrels Inlet, S.C. 29576 for the amount of $7,950.00.[1] Upon information and belief, this document is substantially identical to all 'Promissory Notes' signed by Class Plaintiffs with Innovation Credit Corporation.

_____

[1] An address for Invents Company is also listed as Murrels Inlet, S.C. in paperwork obtained from other Class Members.

84.    Contrary to Defendants' explicit verbal assurance, the Promissory Note provides for an interest rate of eighteen (18) percent per annum.

85.    Ms. Zanotti then made an out-of-pocket "down payment" of $3,000 to Invents, and began paying approximately $250 per month directly to Invents to pay off the Innovations Credit Corporation loan.

86.    At that same meeting, Plaintiff signed a "New Product Marketing Agreement" with "Invents Company, LLC," in which she agreed to "retain [Invents] to submit [her] invention concept to industry by utilizing [Invents'] Customized Marketing Matrix" in exchange for a "one-time investment fee of $7,950.00." Upon information and belief, all Class Plaintiffs signed substantially identical contracts.

87.    Pursuant to that agreement, Invents agreed to "commercialize [Plaintiff's] invention concept," to prepare and send media press releases, design and produce a personalized product web page, produce a thirty (30) second video infomercial, purchase four (4) airtime spots for the infomercial in major markets, contact "targeted" companies for manufacture and distribution of the invention, provide twenty-four (24) hour standby operators to field any calls which may be received regarding Plaintiff's invention, among other things. Upon information and belief, Defendants failed to undertake and/or fulfill these promises for Ms. Zanotti and all Class Plaintiffs.

88.    Pursuant to that agreement, Invents agreed to "use its best efforts to submit the idea, invention, or product to companies for their review." Upon information and belief, Defendants made absolutely no such efforts on behalf of Ms. Zanotti and all Class Plaintiffs.

89.    Pursuant to that agreement, Invents agreed to "submit Client's invention to industry." Upon information and belief, Defendants made absolutely no such efforts on behalf of Ms. Zanotti and all Class Plaintiffs.

90.    Ms. Zanotti repeatedly called Invents' New York office throughout the process and spoke repeatedly to a woman named Dorothy Peterson.

91.    Consistent with its customary practice, on or about the Spring on 2015, Invents referred Ms. Zanotti to a Florida attorney, Ashkan Najafi, www.patent-usa.com for purposes of obtaining a utility patent for her proposed invention. Invents claimed that Mr. Najafi was independent from Invents. Upon information and belief, Mr. Najafi receives all or a substantial percentage of his business from Invents and InventHelp, and the majority of those engagements do not result in the U.S. Patent and Trademark Office utility patents because customers' ideas are usually not patentable because they are not novel and/or unique.

92.    Mr. Najafi presented himself as unaffiliated with Invents and InventHelp.

93.    By letter dated May 7, 2015, Ms. Zanotti engaged Mr. Najafi to represent her for purposes of obtaining a utility patent for the sum of $4490, plus an additional $950-$1500 per response for each "Office Action" that the U.S. Patent and Trademark Office made rejecting her utility patent.

94.    On information and belief, Plaintiff's comb idea is not novel, non-obvious, or otherwise unavailable to the public, and several companies already manufacture and sell products similar to Plaintiffs idea. Thus, it is unsuitable for a utility patent.

95.    Upon information and belief, Mr. Najafi, was aware that Ms. Zanotti's idea was not suitable for a utility patent. Mr. Najafi also had first-hand knowledge of hundreds of his clients, referred by Invents and/or InventHelp, that did not receive utility patents, and who had complained that Invents and/or InventHelp is a fraud. Mr. Najafi, an attorney with a fiduciary duty to Ms. Zanotti, informed her of none of these facts

96.    On or about December 15, 2015, Ms. Zanotti received an email from

"cynthia@invents.com" informing her that Invents would forward Ms. Zanotti' s idea to "Zambro

Manufacturing" and "will notify you if they are interested."  Ms. Zanotti responded with

confusion, asking why the manufacturer would have to "choose" her, and why she could not hire

he own manufacturer.

97.    Rather than responding directly to Ms. Zanotti' s questions, Invents informed Ms.

Zanotti that she was able to send Ms. Zanotti' s idea to the "decision maker" at Zambro, and that

they should wait before attempting to contact other manufacturers.

98.    On or about January 15, 2016, Ms. Zanotti received an email from Mr. Ray

Anderson from "Zambro Manufacturing, Inc." stating, "We are very interested in the Liqui Comb

Project. . . .  We could make it feasible to you without having to go through the expense of starting

your own manufacturing company.  In order to do this, we would hopefully like to offer you a

licensing and manufacturing agreement."   Upon information and belief, many Class Plaintiffs are

contacted by fraudulent manufacturing and/or distribution companies and offered 'new' contracts

with these companies.

99.    Following a pressure-filled telephone conversation, Ms. Zanotti agreed to enter into

a "Manufacturing and Licensing Agreement" with Zambro.

100.    Ms. Zanotti agreed to pay Zambro $3,000, and agreed to make a down payment of

$2,000.  She forwarded her credit card information to Zambro and on February 2, 2016, her card

was charged $2,000 by a company called "Global Express Manufacturing."

101.    Upon information and belief, Zambro Manufacturing and Global Express

Manufacturing are sham companies.

102.    None of the individuals or entities with which Ms. Zanotti dealt fulfilled their contractual and verbal promises to Ms. Zanotti.  To date, Ms. Zanotti has lost over $10,000, not including interest.

103.    The story of Plaintiff Ronese Brooks is strikingly similar to that of Plaintiff Zanotti (as are the stories of all other Class Members).

104.    In or about early 2016, Ms. Brooks believed that she had created a new invention: eyeglasses with detachable and adjustable arms, "Removable Temples."

105.    Ms. Brooks saw various television spots advertising the services of the company InventHelp, promising to help inventors protect, develop and market inventors' ideas.

106.    On or about January 2016, Ms. Brooks contacted InventHelp by telephone to inquire about their services.

107.    An InventHelp representative answered the telephone, took Ms. Brooks' name, telephone number and address, and promised that someone from InventHelp would return her call.

108.    On or about January 2016, Ms. Brooks received a call from someone from "Invents Company."  They set up a meeting for February 2, 2016 at the New York offices of "Invents Company."

109.    On or about February 2, 2016, Ms. Brooks met with Mr. Philip Brown, Invents Company 'Marketing Consultant" at the offices of Invents Company located at 469 7th Avenue, 7th Floor, New York, New York 10018.  At that meeting, Ms. Brooks described her invention to Mr. Brown.  Mr. Brown told Ms. Brooks that she would have to pay an initial fee of $795.00 to get started.  Ms. Brooks declined, telling Mr. Brown that she could not afford the payment and that she was on disability from her job.  Ms. Brooks left the meeting without engaging Invents' services.

110.    In late February, Ms. Brooks received a call from Mr. Brown from Invents Company advising her that Invents Company is extremely interested in her invention.  He told her that his "boss" reached out to him about her invention and that Invents thinks the product is going to be very profitable, and that Invents "will do everything that we can" to help her with her invention because it will surely be a success.

111.    Ms. Brooks was very excited about this news, and scheduled another meeting for March 2, 2016.

112.    On or about March 2, 2016, Ms. Brooks showed up for her meeting at 469 7th Avenue.  She was greeted by Chet Dombrowski.  Mr. Dombrowski told Ms. Brooks that Mr. Brown was transferred to another department.  Mr. Dombrowski told Ms. Brooks that Invents was extremely interested in her invention.  He represented to her that her idea was worth "billions" because the eyewear industry is so large.

113.    During the March 2, 2016 meeting, Mr. Dombrowski told Ms. Brooks that per Invents' procedures, he needed to conduct an initial 'feasibility study,' and he left the room.  When he returned to the meeting, he told Ms. Brooks that her Removable Temples received a "93% score," which meant that it was unique, it would be relatively easy to produce, and would realize huge profits.  He claimed that in all of the "many years" he had worked with Invents, only one other product had ever received a "feasibility score" over 90%.

114.    Upon hearing this information, Ms. Brooks was overjoyed.  She signed a non-disclosure agreement with Invents Company and paid $595 by check for an initial patent search and project summary digest.

115.    Shortly thereafter, Invents telephoned Ms. Brooks and told her that the patent search showed no similar patents, and that Invents wanted to partner with her and proceed with

developing, marketing, advertising, securing license agreements and/or manufacturing deals for her unique invention.

116.    On information and belief, Ms. Brooks' idea is not novel, non-obvious, or otherwise unavailable to the public, and several companies already manufacture and sell products similar to Ms. Brooks' Removal Temples idea.

117.    On or about April 22, 2016, Ms. Brooks again met with Invents at 469 7th Avenue. At that meeting, Mr. Dombrowski presented her with an 'Agreement' and told that the price to do business was $10,000. Ms. Brooks told him that she could not afford $10,000, and that she needed time to review the agreement with an attorney. Mr. Dombrowski employed high pressure tactics, informing her that she qualified for a $1,050 discount, but that she would forfeit that discount if she did not sign that day. Mr. Dombrowski pointed out certain paragraphs in the agreement that purportedly reserved all of Ms. Brooks' legal rights in the event that something untoward happened.

118.    Ms. Brooks signed the contract and handed a check over to Invents Company LLC for $8,950. In exchange for that amount, Invents agreed to "commercialize [Plaintiff's] invention concept," to prepare and send media press releases, design and produce a personalized product web page, produce a thirty (30) second video infomercial, purchase four (4) airtime spots for the infomercial in major markets, contact "targeted" companies for manufacture and distribution of the invention," among other things. Defendants failed to undertake and/or fulfill these promises.

119.    Consistent with its customary practice Invents referred Ms. Brooks to RG Patent Consulting" and Ms. Brooks paid RG Patent Consulting $2,800 for a utility patent on or about October 2017. Upon information and belief, Ms. Brooks' idea is not novel, non-obvious, or otherwise unavailable to the public, and is not suitable for a utility patent.

120.    Upon information and belief, the RG Patent Consulting attorney with whom Ms. Brooks worked, Mr. Robert Kasody, was aware that Ms. Brooks' idea was not suitable for a utility patent.  Mr. Kasody also had first-hand knowledge of hundreds of RG Patent Consulting customers, referred by Invents and/or InventHelp, that did not receive utility patents and complained that Invents and/or InventHelp is a fraud.  Mr. Kasody, an attorney with a fiduciary duty to Ms. Brooks, informed her of none of these facts.

121.    Upon information and belief, RG Patent Consulting receives all or a substantial percentage of her business from Defendants, and the majority of those engagements do not result in U.S. Patent and Trademark Office utility patents because customers' ideas are usually not suitable for such patents because they are not novel and/or unique.

122.    Months passed, and Defendants failed to return all calls from Ms. Brooks when she called repeatedly to inquire about the status of her invention.

123.    Then, after she had lost almost all hope, Ms. Brooks was contacted by "Chet Dombrowski" of "Global Express Manufacturing" on or about January 4, 2018.  Upon information and belief, this was the same individual with whom Ms. Brooks had met on or about April 22, 2016 on behalf of Invents Company.  "Global Express Manufacturing" is also the same entity that charged Plaintiff Zanotti' s credit card on behalf of "Zambro Manufacturing."

124.    Apparently, upon information and belief, Mr. Dombrowski did not recall that he had met with Ms. Brooks on behalf of Invents.

125.    On or about January 4, 2018, Mr. Dombrowski told Ms. Brooks that Global Express Manufacturing had contacts with InventHelp, Invents, and other invention promotion companies, and that Global Express Manufacturing wanted to manufacture Ms. Brooks' proposed invention

for $5,000. He told her that Global Express Manufacturing already had engaged distribution companies and had secured retail shelf space on behalf of Ms. Brooks' invention.

126.    Mr. Dombrowski told Ms. Brooks that Global Express Manufacturing had already engaged another company, "Smith Lilly Health & Beauty Manufacturing Supply" to license and market her invention.

127.    Ms. Brooks was very excited that she still had a chance to make it big with her invention.

128.    Ms. Brooks then expressed concern and confusion to Mr. Dombrowski, telling him that she was still under contract with Invents.

129.    Mr. Dombrowski employed aggressive, high-pressure tactics, telling Ms. Brooks that she was very confused and that he needed to sign a contract with Global Express Manufacturing. Mr. Dombrowski said that he needed an additional $5,000 to move forward with Smith Lilly, and forcefully pressured her for an additional $5,000.

130.    Mr. Dombrowski sent Ms. Brooks a purported contract on behalf of "SmithLilly Health and Beauty Manufacturing Supply," seeking to persuade Ms. Brooks to pay the $5,000. Notably, the signature line of that contract bears the name, "Ray Anderson," the same purported individual who contacted Ms. Zanotti on behalf of "Zambro Manufacturing."

131.    Ms. Brooks telephoned Global Express Manufacturing at the number provided by Mr. Dombrowski the following day, on January 5, and again expressed confusion and concern about the additional funds and arrangement. Mr. Dombrowski again employed extremely high-pressure tactics and told her that she was confused, that he could not understand why she hadn't yet sent him the $5,000, and that it was imperative that she do so immediately. He said, "you're

very fortunate," "you're very blessed," and "you don't understand the magnitude of this."  He told

her that Smith Lilly is "ready to go to work" and that there is "no competition" for her invention.

132.    Thereafter, on or about January 5, 2018, Ms. Brooks telephoned Invents Company

at their New York office.  She spoke to Dorothy Peterson and inquired whether Chet Dombrowski

was with Invents.  Dorothy Peterson told Ms. Brooks that yes, Chet Dombrowski was employed by

Invents.  Ms. Brooks then asked about the status of her invention, and told Ms. Peterson that Mr.

Dombrowski had telephoned her on behalf of Global Express Manufacturing, not on behalf of

Invents, and that he wanted an additional $5,000.  At that point, Ms. Peterson became aggressive

and angry, and told Ms. Brooks (for the first time even though Ms. Brooks called the New York

number and had spoken to Ms. Peterson a number of times) that Ms. Brooks had called the South

Carolina office of Invents, not New York.  Ms. Peterson also backtracked and said that Chet

Dombrowski did not work for Invents.  Ms. Brooks repeatedly asked about the status of her

invention.  To date, neither Invents, InventHelp, or Ms. Peterson has responded to her inquiries.

133.    Ms. Brooks did not feel comfortable sending the additional $5,000 to Global

Express Manufacturing.  The more she questioned Mr. Dombrowski about Global Express

Manufacturing and Invents, the more suspicious she became.  Ultimately, she sent Mr.

Dombrowski and Dorothy@invents.com an email stating her belief that the companies were

engaging in fraudulent business activities.

134.    Rather than contest her assertions, Mr. Dombrowski replied via email, "Happy

Hunting."

135.    Mr. Dombrowski's response is *apropos*: Defendants use sophisticated and crafty

mechanisms to avoid liability by employing a web of seemingly independent entities – invention

promotion companies, private money lenders, patent attorneys, licensing companies, distribution

companies and manufacturing companies – that act in concert to defraud Class Plaintiffs. The ownership (and even existence) of many of these entities is shrouded in mystery. This is a purposeful element of Defendants' fraudulent scheme in their attempt to ensure that potential claimants will never recover any funds.

136.    Upon information and belief, Mr. Dombrowski is listed on various internet websites as employed by Defendants Invention Submission Corporation d/b/a InventHelp and Invents. He at all times herein acted with apparent authority on behalf of all Defendants.

137.    To date, Ms. Brooks has handed over approximately $12,000 to Defendants for fraudulent services that they have not provided.

138.    Plaintiff Sherry Porter's story is also strikingly similar to those of Ms. Zanotti and Ms. Brooks (as are the stories of all Class Members).

139.    In or about January 2013, Ms. Porter believed that she had created a new invention: a pet collar with LED lights to keep pets safe at night, which she named "Light Lock Pet Collar."

140.    Ms. Porter had seen various television commercials for InventHelp.

141.    On or about January 11, 2013, Ms. Porter contacted InventHelp via email.

142.    That same day Ms. Porter was notified that Amanda Herman, an InventHelp representative, would be present at InventHelp's Rochester, New York, Linden Oaks office, and Ms. Porter set an appointment for January 19, 2013.

143.    On January 19, 2013, Ms. Porter met with Amanda Herman and presented her idea. At that meeting, Ms. Porter was impressed with InventHelp's offices and the professionalism and seeming profitability of the Rochester, New York office. Upon information and belief, contrary to its purposeful impression, the Rochester, New York office, and most InventHelp offices throughout the country, are merely rented space and not permanent InventHelp locations.

144.    Amanda Herman expressed extreme excitement about Ms. Porter's idea, and said, "I really hope that you decide to move forward with this idea." Ms. Herman said, "animals get hit by cars daily across the country and world for that matter. Not to mention that this could go far in branching out to have this with children. Your idea isn't just a product that you use in the kitchen, it saves innocent lives and that to me is priceless."

145.    Ms. Herman emphasized that she had never seen a product like this on the market. Upon information and belief, this statement was false or was made with reckless disregard for its truth or falsity.

146.    Ms. Herman said that regardless of patentability, Ms. Porter's idea was extremely marketable and carried immense potential for profit because it could be used not just for pets, but for farm animals and children. Upon information and belief, this statement was false or was made with reckless disregard for its truth or falsity because Ms. Herman had reason to believe that similar items were likely already sold on the open market.

147.    Ms. Porter was overjoyed that InventHelp, a seemingly sophisticated and successful invention promotion company, was impressed with her idea. However, due to financial constraints, she was reluctant to sign a contract right then and there. Ms. Herman told Ms. Porter that InventHelp was wrapping up a special offer, and that it was the last day to receive a $100 discount on the "Basic Information Package."

148.    Ms. Herman also told Ms. Porter that Ms. Porter could finance the cost through an independent loan company, "Universal Payment Corporation."

149.    Ms. Porter signed a "retail installment contract" with Universal Payment Corporation, agreeing to a $300 cash down payment and installments thereafter of $128 per month.

That contract identifies the "Seller" as InventHelp, the "Buyer" as Ms. Porter, and the "Assignee" as Universal Payment Corporation.

150.    Thereafter, Ms. Porter received emails from "universalpaymentcorp.com" with payment receipts.

151.    However, Ms. Porter's first payment pursuant to that contract was charged to "Techno InventHelp."

152.    Shortly thereafter, Ms. Porter began to get nervous about the money she had spent. She performed some internet searches and saw many complaints about InventHelp on various online complaint boards, chat groups, and other online spaces. She sent an email expressing her concern.

153.    By email dated January 22, 2013, Amanda Herman, on behalf of InventHelp, stated, "I actually goggled (sic.) us after our conversation something I haven't done in a long time. I realized that there are several links that have both Inventhelp and Scam , however, they are our own websites that we have created to help inventors from being scammed by shady invention companies, so I am not sure if you have actually clicked on those links to see that they are our sights created to stop invention scams in the business. The only negative info I saw available was 41 complaints. In 29 years of business and 1000's of inventors 41 complaints is a very low percentage for a company to have. I am not discounting the fact that there are a couple unhappy customers, but again all subjective information and you never get the other side of the story when reading their complaints. We work hard to resolve any issues when it comes to customer care, and everything we do here is regulated by a strict compliance department and the FTC. With that said, I urge you to not only research us with the BBB but also click on the links that say inventhelp and scam…..they are not saying we are a scam, we are exposing other companies out there that are."

154.    Upon information and belief, these statements were made with knowing falsity and/or reckless disregard for their truth for the purpose of inducing Ms. Porter to sign contracts with InventHelp. The 'InventHelp / scam' postings found on the internet were NOT posted by InventHelp or by its own websites, as represented by Ms. Herman. The InventHelp complaints online are NOT "our sights (sic) created to stop invention scams in the business," as represented by Ms. Herman. As of January 2013, contrary to Ms. Herman's representation, there were hundreds, if not thousands, of complaints against InventHelp, not, as Ms. Herman stated, only 41.

155.    Throughout the next few weeks, Ms. Porter repeatedly contacted InventHelp and Ms. Herman to express her doubts about the company and the potential profitability of her LED pet collar idea. She was repeatedly urged to go forward and told that InventHelp was successful and that with its help, she would also be successful with her invention, which carried immense potential for profit.

156.    On or about February 25, Ms. Porter received the "Basic Information Package" that she had purchased for approximately $700. She was shocked and disappointed to find that the hard-bound book inaccurately described the invention, appeared to be nothing more than loosely-related cut and pasted information, and focused on dog-walking rather than pet safety.[2] She contacted Amanda Herman at InventHelp and expressed her shock, frustration and disappointment.

157.    By email dated February 25 at 10:46 am, Ms. Herman stated, "Don't be disappointed . First there is a lot of information throughout the basic information package, and I haven't read through it all.  That is the first draft so if you find something is missing after you have gotten through every thing, tell me and we can add what we need to ensure it is all correct

---

[2] Ms. Zanotti and Ms. Brooks also received hard-bound basic information books in connection with their contracts with Invents Company.

and we are all on the same page.  Second, you should schedule to come in and see me when I am in Rochester I will be there Friday 15th-Sunday 17th so we can sit down and go over the second stage options so you fully understand everything.  The one program is designed to have inventors who want to be involved do so but most hire us to do everything for them.  So instead of getting down and out , please let me know what day and time would be great so we can go through everything and get things corrected , added and understood.  One of the major reasons we send out a copy of the work so far, is so that the inventor can proofread and add and make comments to ensure that we are all on the same page."

158.    Upon information and belief, these statements were knowingly false and/or made in reckless disregard of the truth.  Ms. Herman had seen many 'Basic Information Package' reports, and had never experienced InventHelp revising  or correcting the hard-bound report.

159.    Upon information and belief, the 'Basic Information Package' is merely the first step in InventHelp's scheme to draw aspiring inventors into spending tens of thousands of dollars on additional services.  Ms. Herman did not disclose this, nor did she disclose that the purpose of their next meeting was not to revise the book, but rather to "upsell" Ms. Porter on to another, more costly and involved, package.

160.    Consumers who pay for InventHelp's "Basic Information Package" receive a soft-bound "Preliminary Patentability Opinion" signed by Defendants Thomas Frost/Thomas Frost, P.A. Each and every one of these "Opinions" contains identical language, informing consumers of similar patented ideas and asserting that, nonetheless, a utility patent is possible for consumers' proposed inventions.  In truth and in fact, this "Preliminary Patentability Opinion" is an integral part of Defendants' inducement to con consumers into signing the expensive Submission Agreements.  The opinions set forth by Defendant Frost are purposefully skewed and boilerplate.

161.    Contrary to Ms. Herman's explicit representations, InventHelp never revised the "Basic Information Package."

162.    In March 2013, Ms. Porter, her daughter in tow, again met with Amanda Herman at InventHelp's Rochester New York location.  At this meeting, Ms. Herman told her about a recent news story about a cow that was hit by a car.  Ms. Herman emphasized that Ms. Porter's invention was "one of a kind" and that she "must pursue this" as soon as possible in order to capitalize on this huge opportunity, which could amount to "hundreds of millions of dollars."  Upon information and belief, Ms. Herman was lying, had not seen any news story about a cow, did not believe that Ms. Porter's idea was unique or marketable, and did not believe that Ms. Porter's idea would be profitable for her.

163.    At this meeting, Ms. Porter expressed concern about the next level of services offered, namely, "submission" services for over $10,000.

164.    Ms. Herman pressured Ms. Porter, telling her that it was the last day of a 'rare special' where she would get $1,900 off the $11,000 price.  Ms. Herman explained that Ms. Porter could use her contract with Universal Payment Corporation to finance the submission services.

165.    Ms. Porter signed a "Submission Agreement" with InventHelp for $9,000.  Upon information and belief, all "Submission Agreements" with InventHelp and/or Western InventHelp are identical.

166.    That Submission Agreement contained disclosures stating that "The total number of customers who have contracted with InventHelp in the past 5 years is 8,095."

167.    Submission Agreements signed in 2018 obtained from potential Class Members state, "from 2015-2017, we signed Submission Agreements with 6,564 clients."  Those agreements

33

state, "We charge $975 for Basic Information Package. We charge from $11,900 to $16,900 for our marketing, licensing or promotional services."

168.    The Submission Agreement signed by Ms. Porter contained disclosures stating that "The total number of customers known by InventHelp to have received license agreements for their inventions as a direct result of InventHelp services is 167." Upon information and belief, this statement is false, as are the similar and/or identical statements made in Submission Agreements signed by all Class Members.

169.    The Submission Agreement signed by Ms. Porter contained disclosures stating, "the total number of clients known to have received more money than they paid InventHelp for submission services as a direct result of these services is 38." Upon information and belief, this statement is false, as are the similar and/or identical statements made in Submission Agreements signed by all Class Members.

170.    Following that March 2013 meeting, Ms. Porter emailed Ms. Herman, stating "I am just trying to come up with some ideas of different ways to finance the $9000.00 that we talked about. One of my thoughts was can I do 4 years verses 3 to bring the payment down?"

171.    AHerman@inventhelp.com replied that Ms. Porter could finance for 4 years, but then Ms. Porter would lose the $1900 discount. Ultimately, Ms. Porter made the higher down payment and financed the Submission Agreement through Universal Payment Corporation.

172.    The Submission Agreement states, among other things, that "InventHelp will prepare a New Product Submission Brochure, which shall include a description of the invention, benefits and features, a 3D graphic or other illustration in color, Standard Industrial Classification (SIC) codes and suggested distribution channels."

173.    The Submission Agreement states, "InventHelp maintains a Data Bank of companies that have registered to receive our clients' submission materials on an ongoing basis. . . . InventHelp will submit Client's invention, product or idea to Data Bank companies in an attempt to obtain a good faith review as set forth in more detail below."  Upon information and belief, this statement is false, as are the similar and/or identical statements made in Submission Agreements signed by all Class Members.

174.    The Submission Agreement states, "Companies registered in our Data Bank have agreed to review submission materials submitted to them by InventHelp in confidence and have signed confidentiality and non-use agreements."  Upon information and belief, this statement is false, as are the similar and/or identical statements made in Submission Agreements signed by all Class Members.

175.    The Submission Agreement states, "Data Bank companies that we have attempted to match with your invention will be sent a copy of Client's New Product Submission Brochure. This is how Data Bank companies may encounter, receive or see your invention and are then in a position to decide whether to conduct a good faith review."

176.    The Submission Agreement states, "Client agrees that InventHelp shall have the exclusive right to submit the idea, invention or product which is the subject of this Agreement, for the sole purpose of attempting to obtain a good faith review and reviewing any interest expressed including the right to use designs, models, patents issued and pending . . . ."

177.    The Submission Agreement contains an 'Affirmative Disclosure Statement,' stating, "From 2009-2011, we signed Submission Agreements with 4,607 clients."

178.    Submission Agreements signed in 2018 obtained from potential Class Members state, "from 2015-2017, we signed Submission Agreements with 6,564 clients."  Those agreements

state, "We charge $975 for a Basic Information Package.  We charge from $11,900 to $16,900 for our marketing, licensing or promotional services."

179.    Submission Agreements signed in 2018 obtained from potential Class Members state, "The total number of customers who have contracted with InventHelp in the past 10 years is 10,272."

180.    By letter dated May 13, 2105, Ms. Porter received a letter from InventHelp stating that "Your New Product Submission Brochure was mailed to the companies on the enclosed report listed as "Data Bank."  Attached to that letter is a list of 48 "Data Bank" companies.

181.    Upon information and belief, this list of Data Bank companies, and Data Bank company lists sent to all InventHelp customers, are shams.  Some of the companies do not exist and are purposefully misspelled to resemble actual existing companies that have no relationship with InventHelp (for example, listing the company as 'Inc.' instead of 'LLC').  Other "Data Bank" companies claim to have no relationship with InventHelp, and have not signed any confidentiality agreements, or any agreements whatsoever, with InventHelp.  Upon information and belief, some of the companies are sham companies and/or are affiliated with InventHelp, such as Allstar Marketing Group, 2 Skyline Drive, Hawthorne, New York and Abrams Gentile Entertainment.

182.    Perhaps most disturbingly, some of the entities listed as Data Bank companies by Invent Help have in fact agreed to receive invention ideas.  However, upon information and belief, in the rare instances that these companies express interest in an invention and attempt to contact InventHelp to proceed further, InventHelp does not return the calls.  These companies are provided no contact with InventHelp other than the 1-800 customer numbers advertised to the public on InventHelp's television commercials, and calls to these numbers on behalf of companies that actually want to proceed are not returned.

183.     Upon information and belief, InventHelp has no infrastructure to deal with companies that actually want to proceed with ideas.   Rather, InventHelp's business model is to take money with absolutely no intention to follow up with any outside company that may be interested in a prospective inventor's idea.

184.     On May 29, 2013 Ms. Porter also signed an "Intromark Proposal" with Intromark Incorporated.  All agreements described herein were signed by 'Amanda Herman' on behalf of the various entities, and were also signed by "Angela Beauchamp" on behalf of the various entities.

185.     Upon information and belief, all individuals who sign Submission Agreements with InventHelp also sign "Intromark Proposals" with Intromark at the very same time, signed by the same InventHelp representatives.  During the meetings at which these documents are signed, the InventHelp representative makes no distinction between the companies, and purposefully gives the impression that all contracts form a single, integrated whole.  All such contracts are ultimately signed by Angela Beauchamp on behalf of all entities, with no distinctions made between the entities.

186.     The Intromark contract states, "Intromark has agreed to attempt to market inventions, ideas or products only where substantial interest has been expressed, or where in Intromark' s sole discretion it wishes to undertake said marketing effort."

187.     The Intromark contract states, "Client further agrees that Intromark during the term of this Proposal shall have the <u>exclusive right to negotiate, and to execute contracts on Client's behalf for the sale and licensing of the idea, invention or product</u>."

188.     Thus, the Intromark contract creates a fiduciary relationship between the client, here, Ms. Porter, and Intromark.

189.     Years passed, and Ms. Porter had lost all hope that she would make it big with her invention.

190.     Then, in March 2018, InventHelp repeatedly contacted Ms. Porter by telephone and email claiming that someone was interested in her invention.  Ms. Porter did not respond.

191.     In April 2018, InventHelp contacted Ms. Porter again, this time telling her that an interested company wanted to pay her $500.00 to review the paperwork for her invention.  Ms. Porter's interest was piqued by the offer of $500.00, and she returned the call.

192.     By email dated April 18, 2018, Joe Diresta, via email from the address JDiresta@intromark.com stated:  "My name is Joe DiResta, I am happy to make your acquaintance it was nice to speak to you. As we discussed we have a company who we work with that is willing to give us $500.

To hold the product for 60 days from the time we sign the deal.  This is not a transfer of rights it is a license for them to review the item.

I will be sending a contract over the next day or so if you have any questions please give me a call to discuss.

***Please send me an email back to let me know you received this email.***

Thanks,

        Joseph DiResta

Director of Product Development

        InventHelp/Intromark


        C. 917 991 0204

        O. 412 288 1300 x1416"

193.    Joe Diresta identified himself as "Director of Product Development InventHelp/Intromark," making no distinction between these companies.

194.    The official LinkedIn Profile of Joe Diresta as of May 2018 lists his title as "Director of Product Development at InventHelp" from "July 2008 to present," and his location as New York.

195.    Ms. Porter called Mr. Diresta at 1-412-288-1300, InventHelp's Pittsburgh headquarters, and was overjoyed to learn that a company was interested in licensing her product. She told Mr. Diresta that she wanted to proceed.

196.    That same day, Joe Diresta sent Ms. Porter another email with a "Licensing Agreement" between "Abrams Gentile Entertainment LLC, 244 West 54th Street, 9th Floor, New York, New York," Intromark, and Ms. Porter. Mr. Diresta's email stated: "Hi Sherry,

Thank you for the help with this.

So you have my information, my name is Joe DiResta the Director of Product Development InventHelp/Intromark, it has been nice to speak to you. As we discussed we have a company who we work with that is willing to give us $500.

To hold the product for 60 days from the time we sign the deal. This is not a transfer of rights it is a license for them to review the item.

Attached is the contract and the W9 for tax purposes.

***Please sign and fax or scan back the last/signature page only thank you.

Once we receive your page signed we will reach out to the company for signature. Once the doc is fully executed and we should receive the funds;

 when the check clears you will receive the funds.

This is a 30 day process but you can check in at any time thank you.

*Also attached is a W-9 please fill out and return for our accounting dept.*

**I need both docs filled out and or signed and scanned back or faxed to me  before we can redistribute the funds.**

Thank you very much, please call my cell if you have any questions!

FAX NUMBER 412 338 0497

*Thanks,*


      *Joseph DiResta*

*Director of Product Development*

    *InventHelp/Intromark*


    *C. 917 991 0204*

   *O. 412 288 1300 x1416*

    *F.  412 338 0497"*


197.    Upon information and belief, everything in InventHelp's April 18 communications are outright lies.  The "License Agreement" is a sham.  Abrams Gentile Entertainment, LLC, is also a sham.  The website for Abrams Gentile Entertainment, www.agebrands.com,  describes it as "a New York based concept development group incorporated in 1986 specializing in creating and producing youth consumer products and family brand entertainment with sustainable value. . . .  [It has] created such ground breaking brands as SKY DANCERS,  the Nintendo POWER GLOVE, SHINING STARS."

198.    The website lists the telephone number for Abrams Gentile Entertainment as 1-212-757-0700.  Calls to that number are routed to an operator that answers, "Airport Service," and references a website, www.airportservice.com ; calls to the number provided on the "Airport

Service" website are routed to the same operator service as the one for Abrams Gentile Entertainment.

199.    The purported License Agreement lists its "effective date" as "April 18, 2018" and lists "244 West 54th St., 9 fl., New York City, New York, USA" as Abrams Gentile's "principal place of business." However, upon information and belief, as of April 18, 2018 no tenant resides at that address, and Abrams Gentile is not located in that building.

200.    Contrary to the Abrams Gentile website description, the "License Agreement" sent by Mr. Diresta to Ms. Porter states that Abrams Gentile "is a product and custom accessory & boutique company. They are looking to bring style & fashion to all levels of society. They also look to manufacturer (sic.) custom fashion product for both men and woman and the like, designer and developer of various products for sale in the mass and boutique markets, and is desirous of obtaining an exclusive license to sell INVENTION direct (sic) to their other international customers hereinafter referred to as 'TERRIRORY,'(sic)." Upon information and belief, this contract is a fake and a sham and is being used to further perpetrate a fraud upon Ms. Porter on behalf of InventHelp.

201.    Ms. Porter spoke to Mr. Diresta several times via his Inventhelp office number in Pittsburgh, and corresponded with him on his Inventhelp / Intromark email address, JDiresta@intromark.com.

202.    InventHelp continued to aggressively pursue Ms. Porter, urging her to sign the sham license agreement and the tax document, including repeatedly imploring her to provide her social security number.

203.    By email dated April 23, Joe DiResta stated, "I left a vm for you when you get a chance please execute the below docs if you need please reach out to call me."

41

204.    By email dated April 24, 2018, (11:22 am), Ms. Porter informed Joe DiResta at InventHelp / Intromark that she needed time to think about it.

205.    By email dated April 24, 2018 (11:44 am), JDiresta@intromark.com replied, "Thank you so much for reaching out.  If you have any questions please give me a call.  I just wanna get everything wrapped up before the company changes there (sic.) mind.  I look forward to hearing from you have a great week!!  Joey, Joseph DiResta, The Director of Product Development InventHelp/Intromark."

206.    On Wednesday April 25, 2018, Ms. Porter called Mr. DiResta at his InventHelp Pittsburgh number at approximately 3pm.  She told him that she had some questions and that she did not understand the Abrams Gentile offer.  Mr. DiResta told her that he was on the other line with Hong Kong negotiating a license agreement and would call her back.  Hong Kong is 12 hours ahead of New York time, thus Mr. DiResta was allegedly on a 3am call with someone located in Hong Kong.

207.    Ms. Porter and Mr. DiResta had several more conversations in which Ms. Porter expressed confusion about the deal, and questioned Mr. DiResta about the need for her to send in a W9 tax form.

208.    On the morning of April 30, 2018, Ms. Porter received multiple telephone calls from 1-412-288-1300, InventHelp's Pittsburgh number.  She picked up a call approximately 11am, and spoke to Mr. Diresta, telling him that she did not feel comfortable with her understanding of the deal.

209.    On the morning of May 2, 2018, Ms. Porter spoke with Mr. Diresta again.  She asked him some questions about the $500 check she would receive if she signed the agreement.  Mr. DiResta then responded, "the cost to you doesn't go past the $5,000."  After making that

statement, Mr. DiResta caught himself, and clarified that Ms. Porter would get the $500 check within a week. When Ms. Porter again expressed reservations and lack of understanding, Mr. DiResta told her that the work that she paid InventHelp to do was finally paying off because a company was very interested in her invention.

210. Ms. Porter then informed Mr. Diresta that she would sign the License Agreement with Abrams Gentile Entertainment, and she faxed InventHelp a signed copy to InventHelp's Pittsburgh Headquarters at 1-412-338-0497.

211. Mr. Diresta responded via email at 12:10 pm, "Hi Sherry are you going to be sending me the W9 under a separate cover? Joseph DiResta, The Director of Product Development InventHelp/Intromark."

212. Ms. Porter responded, "Joe we talked about the W9 and I am not comfortable sending that at this time."

213. Mr. Diresta then responded via email, "Thank you again!! Joseph DiResta, The Director of Product Development InventHelp/Intromark."

214. On May 4, 2018, Mr. Diresta emailed Ms. Porter and stated, "Hi Sherri!

W9 all ok. Your check is going out in the next 7 days we have to wait for their (sic.) check to clear.

Thanks Have great weekend!!"

215. Ms. Porter responded and asked Mr. Diresta when she would receive a copy of the fully executed License Agreement.

216.    On May 4, Mr. Diresta responded that he is out of the office and will not return until the week of May 14, at which time he would forward her the fully executed agreement. However, upon information and belief, contrary to Mr. Diresta's representation, he was in fact in his office during the week of May 7, as Ms. Porter asked a friend to call his office number and Mr. Diresta himself answered his telephone.

217.    On or about May 4, a check was issued from "Intromark, Inc., 217 Ninth Street, Pittsburgh, PA 15222" to Sherry Porter.  The authorized signature bears the name of Robert J. Susa.  The memo notation states, "Royalty Advance."

218.    Upon information and belief, as of the date of the instant filing, there already exist on the market scores of dog collars embedded with LED lights.

219.    By email dated May 16, 2018, Mr. Diresta emailed Ms. Porter a purported copy of the fully executed license agreement.

220.    Ms. Porter asked Mr. Diresta if the company was interested in her idea and if and when she would begin to receive royalties.

221.    By email dated May 16, 2018, Mr, Diresta responded that he spoke via telephone with someone from Abrams Gentile Entertainment, and that someone would get back to her about next steps within sixty days.

222.    Upon information and belief, Mr. Diresta, on behalf of the InventHelp Defendants, is using a sham agreement to fraudulently lure Ms. Porter into spending more money for services that Defendants cannot, and do not intend to, provide.

223.    Many potential Class Plaintiffs have trouble paying off their "loans" to Universal Payment Corporation and/or Innovation Credit Corp.  If and when they miss payments, they are inundated with incessant telephone calls and letters demanding payment.

224.    Oftentimes during these calls Defendants use rough and harassing language, and call multiple times a day.

225.    Many Class Plaintiffs have recorded these live calls and messages.

226.    Upon information and belief, Defendants' acts have the same or similar purposes and results *(i.e.* carry out a scheme to defraud Plaintiff and Class Members of money), participants *(i.e.* Defendants), victims *(i.e.* the Plaintiff and Class Members), methods of commission *(i.e.* using television, telephone, in-person meetings, and internet networks to falsely represent to Plaintiff and Class Members that the inventions were patentable and profitable), and are not isolated events.

227.    Upon information and belief, the acts described herein amount to continued fraudulent activity and were committed by Defendants in furtherance of their continuing scheme to defraud Plaintiff and Class Members.

228.    Moreover, the scheme described herein is a continuing operation and poses the threat of continued criminal activity, preying upon unsuspecting victims. Defendants' websites and television commercials continue to tout their invention promotion services to lure potential inventors to enter into contracts with Defendants for fraudulent invention promotion services.

229.    Upon information and belief, Defendants defrauded other victims before, during and after they defrauded Plaintiffs. The foregoing demonstrates that there is no obvious terminating goal or date for the fraudulent activity; the foregoing acts are part of the Defendants' ongoing, regular way of doing business; and Defendants operate a long-term association that exists for criminal purposes *(e.g.,* fraudulently inducing potential inventors to enter into contracts that obligate the inventors to pay money to Defendants).

230.    Defendants' conduct employs the use of the public telephone, television, U.S. mail, and internet networks.

231.    The injuries to Plaintiffs and the members of the Class were caused by Defendants' scheme of fraudulently inducing Plaintiffs and Class Members, through false promises, misrepresentations, and omissions, to enter into contractual agreements.

232.    Furthermore, most of the misrepresentations and omissions alleged herein are contained on Defendant's websites.

## CLASS ALLEGATIONS

233.    Plaintiffs bring this action individually and as a Class pursuant to Federal Rule of Civil Procedure 23, the requirements of such are met with respect to the classes as defined below.

234.    The Class consists of: All persons and entities in the United States who purchased goods and/or services from Defendants.

235.    Plaintiffs also seek certification, to the extent the Court deems it necessary and appropriate, of 2 subclasses of individuals defined as:  (1) All persons and entities in the United States who purchased goods and/or services from the InventHelp Defendants (comprised of Defendants Invention Submission Corporation d/b/a InventHelp, Technosystems Consolidated Corp., Technosystems Service Corp., Western Invention Submission Corp., Universal Payment Corporation, Intromark Incorporated, Robert J. Susa, Abrams Gentile Entertainment LLC, Abrams Gentile Entertainment, Inc., Thomas Frost P.A., Crossley & Stevenson, Law Office of Kyle A. Fletcher, and/or Kaufhold & Dix); and (2) All persons and entities in the United States who purchased goods and/or services from the Invents Company Defendants (comprised of Defendants Invents Company, Invents Company LLC, Innovation Credit Corp., Global Express Manufacturing, Smithlily Manufacturing, Zambro Manufacturing, Inc., Ashkan Najafi, Esq., RG Patent Consulting LLC, Rachel Gilboy, Ruth Eure, and/or Patents for People).

46

236.    Subject to additional information obtained through further investigation and discovery, the foregoing definitions may be expanded or narrowed by amendment.

237.    Excluded from the Class are Defendants; any parent, subsidiary, or affiliate of Defendants; any entity in which any Defendant has or had a controlling interest or which Defendants otherwise control or controlled; any officer, director, legal representative, predecessor, successor, or assignee of a Defendant.

238.    This action is properly maintainable as a class action.

239.    The Class is so numerous that joinder of all individual members in one action would be impracticable. There are thousands of consumers who are Class Members described above who have been damaged by Defendants' deceptive and misleading practices. Submission Agreements signed in 2018 obtained from potential Class Members state, "the total number of customers who have contracted with InventHelp in the past 10 years is 10,272." Submission Agreements signed in 2018 obtained from potential Class Members state, "from 2015-2017, we signed submission agreements with 6,564 clients." The exact number of class members can be determined by appropriate discovery.

240.    Plaintiffs' claims are typical of the claims of the Class Members. All are based on the same legal theories and arise from the same unlawful, fraudulent, reckless and/or willful conduct. The violations of statutory and common laws and the relief sough herein are common to Plaintiffs and the members of the Class.

241.    There are questions of fact and law common to all Class Members that predominate over questions which may affect individual members. These include the following:

   a.  Whether Defendants made false and/or misleading statements to the Class and the public at large concerning the legitimacy of their goods and services;

b.  Whether Defendants' business model, which is uniformly directed and applied to all of
    their customers, is in fact geared toward and/or effective in helping consumers market
    and/or profit from their inventions, as Defendants claim in their advertisements;

c.  Whether the disclosures set forth in Defendants' contracts, which are identical and
    uniform, are truthful and in compliance with the American Inventors Protection Act of
    1999, 35 U.S.C. § 297;

d.  Whether Defendants' acts described herein, and developed upon further discovery,
    constitute a mode and practice that pervades the companies and/or enterprise, including
    promulgating policies and/or instruction to use common fraudulent practices;

e.  Whether Defendants had a pattern or practice of making fraudulent and false
    representations to consumers in order to induce them to sign contracts;

f.  Whether Defendants had a pattern or practice of making fraudulent and false
    representations to consumers that their ideas were suitable for utility patents;

g.  Whether Defendants are responsible for the conduct alleged herein, which was and is
    uniformly directed at all consumers who purchased Defendants' products and services;

h.  Whether Defendants' advertisements and business practices violate N.Y. G.B.L. §§
    349-350;

i.  Whether Defendants' misconduct set forth herein demonstrates that Defendants
    engaged in unfair, fraudulent, and/or unlawful business practices with respect to the
    advertising, marketing and sale of their products and services;

j.  Whether Defendants' false and misleading statements were likely to deceive the public;

k.  Whether Defendants created an enterprise by working in concert to defraud Plaintiffs
    and Class members;

l.  Whether Defendants engaged in a conspiracy to work in concert to defraud Plaintiff sand Class members;

m. Whether Defendants made fraudulent misrepresentations and misleading statements with the intent to mislead consumers;

n.  Whether Defendants fraudulently misrepresented the potential patentability and profitability of proposed inventions to Plaintiff and Class members.

o.  Whether Defendants breached the covenant of good faith and fair dealing by committing the acts described herein;

p.  Whether Plaintiffs and the Class have sustained damages and, if so, the proper measure thereof; and

q.  Whether Defendants should be enjoined from the actions described herein.

242.  Plaintiffs are adequate Class representatives because their interests do not conflict with the interest of the Class Members they seek to represent; their claims are common to all members of the Class and are based upon the same facts (practice or course of conduct) undertaken by Defendants' with respect to all Class Members and are based upon the same legal theories; they have a strong interest in vindicating their rights.  The Class Members' interests will be fairly and adequately protected by Plaintiffs and counsel.  Defendants have acted in a manner generally applicable to the Class, making relief appropriate with respect to Plaintiff and the Class Members.

243.  Plaintiffs have retained counsel experienced and competent in the prosecution of complex class action litigation and they intend to vigorously prosecute this action.  Plaintiffs and their attorneys are familiar with the subject matter of this action and have already expended

hundreds of hours ascertaining, researching and investigating the allegations herein, including participating in individual meetings with scores of potential Class Plaintiffs.

244. A class action is superior to other available means for the fair and efficient adjudication of the claims of the Class members. Common issues of law and fact predominate, as the primary focus is Defendants' deceptive and misleading practices.

245. The proposed class is (i) the surest way to fairly and expeditiously compensate so large a number of injured persons that constitute the Class; (ii) to keep the courts from being inundated by thousands of repetitive cases; and (iii) to reduce transaction costs so that the injured class members can obtain the most compensation possible. Accordingly, class treatment presents a superior mechanism for fairly resolving similar issues and claims without repetitious wasteful litigation.

246. Importantly, individual Class Members here lack resources to undertake the burden and expense of individual prosecution of these claims. In the past, many individuals have filed claims against one or more Defendants, often in a *pro se* capacity, but have been largely unsuccessful due to Defendants' vast resources and bullying tactics.

247. Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case. It also presents a potential for inconsistent or contradictory judgments. In contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendants' liability.

248.    Without a class action, Defendants will likely retain the benefit of their wrongdoing and will continue a course of action which will result in further damages to Plaintiff and Class Members.

## CLAIMS FOR RELIEF

### COUNT I
**Against All Defendants**
**(Violations of New York General Business Law § 349)**

249.    Plaintiffs reallege and incorporate herein by reference each and every foregoing paragraph of this Complaint as if set forth in full.

250.    New York General Business Law ("GBL") § 349 prohibits any business or person from engaging in deceptive business practices in the conduct of any business, trade or commerce or in the furnishing of any service in New York state.

251.    Defendants have repeatedly and persistently engaged in material deceptive or misleading consumer-related business practices, i.e., advertising, publishing and selling invention promotion, patent, manufacturing, licensing and consultation services that they do not (nor intend to) provide, misrepresenting the viability and potential profitability of Plaintiffs' proposed inventions, and lying and/or coercing Plaintiffs into signing fraudulent contracts.

252.    The implementation, publication, and dissemination of Defendants' invention promotion, patent, manufacturing, licensing and consultation services has been, and continues to be, materially misleading and deceptive to members of the Class and to Plaintiffs in material respects.

253.    The implementation, publication, and dissemination of Defendants' invention promotion, patent, manufacturing, licensing and consultation services are directed toward

consumers and has a broad negative impact on the general public, including Plaintiffs and members of the Class.

254.    Plaintiffs and Class Members have been injured by reason of being deceived by Defendants into paying Defendants for purported services that Defendants did not (and did not intend to) provide.

255.    Defendants' deceptive practices were and are consumer-oriented.  Defendants advertise via television commercials and internet web pages, among other things, thereby deceiving and attracting large numbers of consumers, including the inclusion of identical, false disclosures in Defendants' contracts.

256.    Defendants' material misrepresentations were and are substantially uniform in content, presentation and impact upon consumers at large.

257.    Defendants' misconduct described herein was intentional, willful, malicious, and in blatant disregard of, or grossly negligent and reckless with respect to, Plaintiffs and the other members of the Class.  Defendants are therefore additionally liable for punitive damages, in an amount to be determined at trial.

258.    Plaintiffs and other members of the Class entered into agreements with Defendants herein and suffered ascertainable loss as a direct and proximate result of Defendants' actions.

259.    Defendants use email and other forms of electronic communication to deceive, defraud, and pressure Plaintiff and Class Members, misleading them about the patentability and profitability of their inventions.  Defendants work in concert to induce Plaintiff and Class Members to enter into contracts and/or become indebted to Defendants.

260.    Plaintiffs are entitled to damages, including punitive damages, injunctive relief, and attorneys' fees.

## COUNT II
### Against All Defendants
### (Violation of New York General Business Law, §§ 350, 350-a)

261.    Plaintiffs reallege and incorporate herein by reference each and every foregoing paragraph of this Complaint as if set forth in full.

262.    GBL § 350 prohibits false advertising in the conduct of any business, trade or commerce or in the furnishing of any service in New York State.

263.    Defendants craft their advertisements, marketing materials, and meetings with consumers to create the impression that they have successfully helped other inventors, and thus that they are reliable and reputable.  In truth and in fact, Defendants fail to fulfill almost every promise they make to consumers.  After Defendants collect thousands of dollars from consumers (many of modest means) and string them along for months or years, Defendants fail to provide any of the services that they had promised to provide.

264.    Defendants have repeatedly and persistently engaged in material deceptive, misleading or false advertising, i.e., disseminating deceptive, misleading or false advertising about their purported invention promotion goods and services that was directed at and which affected consumers, a group that includes Plaintiffs, in violation of GBL § 350 and § 350-a.  Defendants' deceptive misleading or false advertising alleged herein are likely to mislead, and have misled, reasonable purchasers of Defendants' services.

265.    InventHelp fraudulently targets minorities and women through the use of misleading websites, including www.black-inventor.com and www.women-inventor.com  These websites, although purporting to be educational pages, are in fact InventHelp advertisements.

266.    Plaintiff and Class Members reasonably and justifiably relied on Defendants' deceptive, misleading or false advertising in purchasing Defendants' purported goods and services.

267.    Defendants' violation of GBL § 350 has caused Plaintiff and Class Members to suffer injury including paying Defendants for purported goods and services that Defendants did not (and did not intend to) provide.

268.    Defendants' deceptive practices were and are consumer-oriented.  Defendants advertise via television commercials and sophisticated internet web pages, among other things, thereby deceiving and attracting large numbers of consumers.

269.    Defendants willfully and knowingly engaged in the conduct described above.

270.    Plaintiffs are entitled to damages, including punitive damages, injunctive relief, and attorneys' fees.

### COUNT III
**Against All Defendants**
**(Fraud)**

271.    Plaintiffs reallege and incorporate herein by reference each and every foregoing paragraph of this Complaint as if set forth in full.

272.    Fraud permeates all of the dealings and contracts between Class Plaintiffs and all Defendants herein, from start to finish.

273.    The agreements and contracts signed by Class Plaintiffs are part and parcel of a grand fraudulent scheme perpetrated by Defendants.

274.    Defendants made and continue to make false and fraudulent statements, false promises, misleading representations, and omitting material facts to Plaintiff and Class members pertaining to the uniqueness, patentability, and profitability, among other things, of their inventions, as set forth above, including the inclusion of identical, false disclosures in Defendants' contracts.

275.    As set forth *infra*, throughout the course of dealings between Plaintiffs and Defendants, Defendants make many blatant misrepresentations and omissions of present fact, including that certain external companies are interested in Plaintiffs' inventions, when those companies do not exist or have not in fact expressed interest; that Defendants have strong relationships with "Data Bank" companies; that Defendants have never seen items similar to Plaintiffs' inventions; that Defendants believe that consumers' proposed inventions are likely to make a profit; among other things.

276.    Defendants fraudulently misrepresent their identities to Class Plaintiffs, holding themselves out to be representatives of companies that do not in fact exist, and/or holding themselves out to be acting on behalf of one company, when in fact they are acting on behalf of Defendants.

277.    Defendants fraudulently misrepresent the actual content of the contracts between Defendants and Class Plaintiffs, thereby tricking Class Plaintiffs into signing documents that state different terms and conditions than those represented by Defendants.

278.    Defendants also falsely represent verbally that their services will likely result in financial gain for consumers in order to induce Plaintiffs to sign the various contracts at issue, when, in truth and in fact, Defendants do not believe this to be the case, and, upon information and belief, Defendants have often seen these very same inventions before.

279.    Defendants falsely represent that they will undertake certain services on consumers' behalf, including but not limited to marketing and promotion of Plaintiffs' proposed inventions. In truth and in fact, Defendants do none of these things.

280.    Defendants falsely represent that the services they provide will help Plaintiffs monetize their inventions. In truth and in fact, Defendants' business model is ineffective and is not geared toward actually helping consumers.

281.    Defendants falsely represent themselves to be independent companies, but they are part and parcel of a single, grand scheme.

282.    Defendants represent themselves to be manufacturing and distribution companies, and/or represent that they have contacted such companies on behalf of Plaintiffs. These representations are false.

283.    Defendants often offer to give Class Plaintiffs "discounts" that are "about to expire." If Class Plaintiffs request time to think about signing the contracts and/or making the substantial monetary commitment, Defendants inform them that the discount will be revoked if they do so. Upon information and belief, these discounts and specials are shams.

284.    If and when Class Plaintiffs express questions or concerns about forfeiting any legal rights that they may have, Defendants' deceptively point out provisions in the purported contracts that appear to retain Class Plaintiffs' rights, while hiding those provisions that seek to vanquish those same rights; Defendants also falsely state that the contracts are "no risk" when in fact they are not.

285.    Defendants made many other material misrepresentations to and concealed or suppressed material facts from Class Plaintiffs.

286.    Defendants knew or believed these material misrepresentations and omissions to be false, or made them with reckless regard for the truth.

287.    Defendants misrepresented, concealed or suppressed these facts with the intent to defraud Class Plaintiffs inducing them to purchase Defendants' services and goods.

288.    Class Plaintiffs were reasonable in relying on Defendants' misrepresentations and

omissions of material facts because Defendants advertised and held themselves out to be credible,

legitimate and experienced sellers of invention promotion, manufacturing, distribution, and other

such services, and as having extensive knowledge and expertise in bringing new inventions to

fruition.

289.    At the time Class Plaintiffs acted, they were unaware of the false, concealed and/or

suppressed facts and would not have purchased Defendants' goods and services had they known

the true facts.

290.    All Defendants are liable for the tortious conduct of the other Defendants, as they

(a) performed the tortious acts in concert with the others and pursuant to a common design with

them, (b) knew that the other Defendants' conduct constituted tortious conduct and gave

substantial assistance or encouragement to the other Defendants, and (c) gave substantial

assistance to the other Defendants in accomplishing the tortious result and their own conduct,

separately considered, constituted tortious conduct towards Plaintiff and Class members.

291.    As a direct and proximate result of Defendants' misrepresentations and

concealment of material facts, Class Plaintiffs have suffered damages, the precise amount to be

determined at trial.


## COUNT IV
### Against All Defendants
### (Negligent Misrepresentation)

292.    Plaintiffs reallege and incorporate herein by reference each and every foregoing

paragraph of this Complaint as if set forth in full.

293.    Defendants made misrepresentations and other statements in connection with their deceptive invention promotion, patent, manufacturing, licensing and consultation services.

294.    Defendants made these representations while in privity of contract with Plaintiffs.

295.    The misrepresentations were and are false, deceptive and misleading at the time they were made.

296.    Upon information and belief, at the time they were made, Defendants knew that the statements were false, deceptive and misleading.

297.    Upon information and belief, Defendants stated, disseminated, published and advertised the misrepresentations with the intent to deceive and defraud the general public, including Class Plaintiffs.

298.    Class Plaintiffs were unaware of the falsity of the misrepresentations and relied upon the misrepresentations and as a result have been defrauded out of large sums of money.


## COUNT V
### Against All Defendants
### (Breach of Contract)

299.    Plaintiffs reallege and incorporate herein by reference each and every foregoing paragraph of this Complaint as if set forth in full.

300.    Defendants and Plaintiffs and members of the Class entered into various contracts, including "New Product Marketing Agreements," "Promissory Notes," "Licensing Agreements," "Manufacturing Agreements," and agreements for legal services related to obtaining utility patents.

301.    Defendants failed to fulfill the obligations set forth in the above-referenced contracts, thereby breaching their respective contracts with Plaintiffs, and Plaintiffs have been damaged thereby.

302.    Upon information and belief, Defendants executed substantially identical contracts with all Class Plaintiffs and failed to fulfill their obligations set forth in those contracts, damaging Class Plaintiffs.

303.    By reason of the foregoing, Defendants are liable to Plaintiffs and members of the Class for the damages they have suffered as a result of Defendants' actions, the amount of such damages to be determined at trial, plus attorneys' fees.

## COUNT VI
### Against All Defendants
### (Breach of Duty of Good Faith & Fair Dealing)

304.    Plaintiffs reallege and incorporate herein by reference each and every foregoing paragraph of this Complaint as if set forth in full.

305.    Every contract contains an implied covenant of good faith and fair dealing in the performance and enforcement of the contract.  The implied covenant is an independent duty and may be breached even if there is no breach of the contract's express terms.

306.    Under the contracts described herein, Plaintiffs and Class Members reasonably expected Defendants' to carry out the covenants set forth in those contracts.

307.    Defendants arbitrarily and unreasonably did not fulfill the various covenants set forth in the contracts, even though they in fact represented to Plaintiffs and Class Members that they would make best efforts to do so.

308.    Defendants acted in bad faith.

309.    As a result, Defendants' are liable to Plaintiffs and Class Members for damages in an amount to be determined at trial and attorneys' fees.


## COUNT VII
### Against All Defendants
### (Unjust Enrichment)

310.    Plaintiffs reallege and incorporate herein by reference each and every foregoing paragraph of this Complaint as if set forth in full.

311.    Defendants' conduct as described herein allowed Defendants to knowingly realize substantial revenues from selling their goods and services at the expense of, and to the detriment or impoverishment of, Class Plaintiffs, and to Defendants' benefit and enrichment.  Defendants have thereby violated fundamental principles of justice, equity and good conscience.

312.    Class Plaintiffs conferred significant financial benefits and paid substantial compensation to Defendants.

313.    It is inequitable for Defendants to retain the benefits conferred by Class Plaintiffs.

314.    By reason of the foregoing, Defendants are liable to Plaintiffs and members of the Class for the damages they suffered as a result of Defendants' actions, the amount of which shall be determined at trial, plus attorneys' fees.


## COUNT VIII
### Against Attorney Defendants and Intromark, Inc.
### (Breach of Fiduciary Duty)

315.    Plaintiffs reallege and incorporate herein by reference each and every foregoing paragraph of this Complaint as if set forth in full.

316.    Defendants Ashkan Najafi, Esq., RG Patent Consulting, Rachel Gilboy, Thomas Frost, P.A., Thomas Frost, Kaufhold & Dix, Ruth Eure, Patents for People, Crossley & Stevenson, and Kyle A. Fletcher (the "Attorney Defendants") and Intromark owe Class Plaintiffs fiduciary duties, including advising and acting in Class Plaintiffs' best interests.

317.    Defendants Thomas Frost/Thomas Frost, P.A. set forth knowingly false and incomplete information and opinions in the Preliminary Patentability Opinions, which is a central element of the scheme set forth herein.

318.    The Attorney Defendants breached their fiduciary duties of care by, among other things, advising Class Plaintiffs to apply for utility patents even though Defendants were aware that Class Plaintiffs' idea were not suitable for utility patents for various reasons. Defendants also had first-hand knowledge of hundreds of customers, referred by Invents and/or InventHelp, that did not receive utility patents and complained that Invents and/or InventHelp are frauds. Yet, Defendants informed Class Plaintiffs of none of these facts and instead advised them to proceed and apply for utility patents.

319.    Pursuant to contracts between the parties, Defendant Intromark Inc. agreed to act in Plaintiffs' best interests and was given the exclusive right "to negotiate, and to execute contracts on [Class Members'] behalf . . . ." Upon information and belief, Intromark defrauded Class Plaintiffs by falsely representing that companies were interested in Class Plaintiffs' proposed inventions, when, in truth and in fact, no such companies expressed any interest and/or even existed.

320.    Class Plaintiffs have been damaged by Defendants' breach of their fiduciary duties.

<u>COUNT IX</u>
**Against All Defendants**
**(Violation of the American Inventors Protection Act of 1999, 35 U.S.C. § 297)**

321.    Plaintiffs reallege and incorporate herein by reference each and every foregoing paragraph of this Complaint as if set forth in full.

322.    Defendants are "invention promoters" as defined by the American Inventors Protection Act of 1999, 35 U.S.C. § 297 ("AIPA").

323.    The "Basic Information Package Agreements" and "Submission Agreements" are contracts for invention promotion services as defined by the AIPA.

324.    Plaintiff and Class Members are customers as defined by the AIPA.

325.    Defendants contracted with Plaintiff and Class Members to provide them with invention promotion services as defined by the AIPA.

326.    Defendants violated the AIPA by not providing the proper disclosures to Plaintiff and Class Members prior to entering into contracts for invention promotion services.  As detailed *supra*, Defendants' purported disclosures are inaccurate, internally inconsistent, and fraudulent.

327.    Defendants violated the AIPA by making materially false and fraudulent statements to Plaintiff and Class Members, and are therefore liable for all damages prescribed by the AIPA.

328.    By reason of the foregoing, Defendants are liable to Plaintiff and the Class for actual damages and statutory trebling of those damages, together with punitive damages, attorneys' fees, costs, and interest.

## COUNT X
### Against Universal Payment Corporation and Innovation Credit Corp.
### (Violation of the Telephone Consumer Protection Act, 47 U.S.C. § 227)

329.    Plaintiffs reallege and incorporate herein by reference each and every foregoing paragraph of this Complaint as if set forth in full.

330.    The Telephone Consumer Protection Act ("TCPA") provides that it is a violation for any person: (A) to make any call . . . using an automatic telephone dialing system or an artificial or prerecorded voice" . . . (iii) to any telephone number assigned to a . . . cellular telephone service." 47 U.S.C. § 227(b)(a)(A)(iii).

331.    Upon information and belief, Defendants use automatic telephone dialing systems and/or other prohibited means to call Class Plaintiffs' cell phones after being told to cease and desist.

332.    As set forth herein and as will be uncovered and disclosed in discovery, Defendants use abusive and harassing tactics in order to collect debts from Class Plaintiffs.

333.    As set forth herein and as will be uncovered and disclosed in discovery, Defendants often threaten to take legal action and/or make other threats in order to coerce Plaintiffs to pay their bills.

334.    As set forth herein and as will be uncovered and disclosed in discovery, Defendants often call Plaintiffs multiple times per day, both on land lines and cell phone lines.

335.    Many Class Plaintiffs have recorded these live calls and messages.

336.    As a result of the above willful and malicious violations, Plaintiffs suffered and continue to suffer personal humiliation, mental anguish, and emotional distress, and Defendants are liable for actual damages, statutory damages to the fullest extent permissible by law, costs and attorneys' fees.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

**WHEREFORE**, Plaintiffs, on behalf themselves and the Class, pray that the Court:

(a) Issue an Order certifying the Class as defined above, appointing the Plaintiffs as Class Representatives, and designating their Attorneys as Class Counsel;

(b) Find that Defendants have committed the violations of statutory and common law alleged herein;

(c) Enter an Order granting monetary relief, including punitive damages on behalf of the Class in an amount of at least $36,000,000.00, the precise amount of which is to be determined at trial;

(d) Enter an Order granting monetary relief, including compensatory damages on behalf of the Class in an amount of at least $72,000,000.00, the precise amount of which is to be determined at trial;

(e) Enter an Order granting monetary relief, including treble damages, on behalf of the Class, the precise amount of which is to be determined at trial;

(f) Enter an Order granting monetary relief, including statutory damages, the precise amount of which is to be determined at trial;

(g) Determine that Defendants have been unjustly enriched as a result of their wrongful conduct, and enter an appropriate Order awarding restitution and monetary damages;

(h) Enter an Order granting all appropriate relief on behalf of the Class under the applicable state statutory and common laws;

(i) Enter judgment including interest, costs, reasonable attorneys' fees, and expenses;

(j) Entering preliminary and permanent injunctive relief against Defendants, directing

Defendants to correct their practices and to comply with New York consumer

protection laws; and

(k) Granting such other and further relief as the Court may deem just and proper.

Dated: White Plains, New York
August 23, 2018

OXMAN LAW GROUP, PLLC
*Attorney for Plaintiff*

By: _____
    JULIE PECHERSKY PLITT, ESQ.
120 Bloomingdale Road, Suite 100
White Plains, New York 10605
(914) 422-3900
(914) 422-3636 (Fax)
jplitt@oxmanlaw.com

65